IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

**ELIJAH WHITE**,                             )
                                              )
                    Plaintiff,                )
                                              )
          v.                                  )          2:23cv1883
                                              )          **Electronic Filing**
**JASON WALSH** Interim District Attorney     )
of Washington County, **JOHN DISALLE**        )
in his Individual Capacity as President       )
Judge of Washington County,                   )
                                              )
                    Defendants.               )

## OPINION

Elijah White ("plaintiff") commenced this civil rights action seeking redress for the alleged conspiratorial violation of his Fifth Amendment right against self-incrimination. He maintains that consistent with an established pattern of conduct, Interim Washington County District Attorney Jason Walsh ("Walsh") and then President Judge of the Court of Common Pleas of Washington County John DiSalle ("DiSalle") bypassed the internal operating procedures of the Count of Common Pleas in order to punish plaintiff for refusing to answer questions in a proceeding before a magisterial district judge. In doing so, defendants acted maliciously and intentionally for the purpose of punishing plaintiff for invoking his fundamental rights. Ultimately Judge DiSalle found plaintiff to be in contempt and imposed a sentence of incarceration. Plaintiff served that sentence, filed an appeal to the Superior Court of Pennsylvania (which remains pending) and filed this action advancing federal and state claims for false imprisonment, false arrest, malicious prosecution, conspiracy, abuse of process, violation of substantive due process, and intentional infliction of emotional distress. Presently before the court are defendants' motions to dismiss based on judicial, prosecutorial, sovereign

and high public official immunity as well as being barred by the doctrine of <u>Heck v. Humphry</u>, 512 U.S. 477 (1994).  For the reasons set forth below, the motions will be granted.

As a general matter, defendants' motions do not attack the sufficiency of plaintiff's complaint pursuant to the general standards of review governing the adequacy of pleadings under Rule 8.[1]  Instead, they contend that the complaint and the state court records establish that they are entitled to immunity.  Defendants maintain that the court can grant their motions on the face of the pleadings notwithstanding plaintiff's extensive factual allegations seeking to defeat their immunity defenses.

It is well-settled that in reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "[t]he applicable standard of review requires the court to accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the non-moving party."  <u>Rocks v. City of Philadelphia</u>, 868 F.2d 644, 645 (3d Cir. 1989).  And while the focus in assessing a motion to dismiss is on the allegations set forth in the pleadings, "matters of public record, orders [and] exhibits attached to the complaint" also may be considered.  <u>Oshiver v. Levin, Fishbein, Sedran & Berman</u>, 38 F.3d 1380, 1384 n.2 (3d Cir. 1994) (citing 5A WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE, § 1357); <u>Buck v. Hampton Twp. Sch. Dist.</u>, 452 F.3d 256, 260 (3d Cir. 2006) (In assessing the application of immunity pursuant to a motion to dismiss, the court may also consider "any matters incorporated by reference or integral to the claim, items subject to judicial notice, and matters of public record.").

---

[1] The sole exception is Walsh's attack on the sufficiency of the allegations supporting plaintiff's claim for civil conspiracy at count V.

Although immunity is an affirmative defense, "a complaint may be subject to dismissal under Rule 12(b)(6) when an affirmative defense . . . appears on its face." ALA, Inc. v. CCAIR, Inc., 29 F.3d 855, 859 (3d Cir. 1994); see also 5A CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1357, at 358–59 (1990) (citing cases). Accordingly, an immunity defense "will be upheld on a 12(b)(6) motion only when the immunity is established on the face of the complaint." Leveto v. Lapina, 258 F.3d 156, 161 (3d Cir. 2001) (quoting Hafley v. Lohman, 90 F.3d 264, 266 (8th Cir.1996) (citation omitted)); accord Pani v. Empire Blue Cross Blue Shield, 152 F.3d 67, 74 (2d Cir. 1998) (recognizing entitlement to official immunity on face of complaint); Santamorena v. Georgia Military College, 147 F.3d 1337, 1342 (11th Cir. 1998) (recognizing entitlement to qualified immunity on face of complaint).

Plaintiff's amended complaint sets forth the following series of events. On October 10, 2022, Jaison Irwin was shot to death outside of Bob's Tavern in Finleyville, Pennsylvania. Amended Complaint (Doc. No. 14) at ¶ 15. On November 17, 2022, Washington County Detective Matthew Collins filed homicide charges for the death of Irwin against Keaundre Crews and Marissa Spencer. Id. at ¶¶ 13-14.

As part of the investigation into Irwin's death, on October 11, 2022, and October 12, 2022, Collins presented Applications for Search warrants for the home and cellular telephone of plaintiff. Among other things, Collins sought the clothing worn by plaintiff "during the shooting of Jaison Irwin." Id. at ¶¶ 15, 17. Collins presented the applications to Judge DiSalle, who reviewed and approved the applications, leading to the issuance of the warrants. Id. at ¶¶ 16, 18. No incriminating evidence was discovered when the warrants were executed. Id. at ¶ 19.

Collin's investigation also focused on video surveillance from Jim's Bar, which is in close proximity to Bob's Tavern where the homicide occurred. Collins obtained the video, which "was alleged" to have shown plaintiff at Jim's Bar and interacting with Irwin twenty to thirty minutes

before the shooting.  Id. at ¶¶ 20-22.  The interaction was alleged to have been an altercation between plaintiff and Irwin.  Id. at ¶¶ 34, 36.

On December 9, 2023, a preliminary hearing was conducted on the homicide charges against Crews and Spencer.  Walsh served a subpoena on plaintiff and called him to testify at the hearing as a witness for the Commonwealth.  Walsh refused to offer immunity to plaintiff prior to questioning him.  Id. at ¶¶ 24-27.  The hearing was held before Magisterial District Judge Melograne.  Id. at ¶¶ 32, 34, 42.

Upon receiving the subpoena, plaintiff retained criminal defense attorney Ryan Tutera, who appeared and represented plaintiff at the hearing.  After calling plaintiff to the stand, Walsh asked plaintiff if he recalled October 9th and October 10th of 2022.  On the advice of counsel, plaintiff invoked his Fifth Amendment right against self-incrimination.  Walsh questioned whether plaintiff was invoking the Fifth Amendment as to date and time, and plaintiff responded affirmatively.  Id. at ¶¶ 26, 28-31.  Walsh asserted that plaintiff's position was "ridiculous" and "nonsense" and then stated on the record that all he was going to do was inquire whether plaintiff was at Jim's Bar on that night just prior to the shooting, which Walsh asserted was "non-incriminating."  Id. at ¶¶ 32-35.

Plaintiff avers he had three reasons to invoke his Fifth Amendment rights: 1) admitting to getting into an altercation with Irwin shortly before the shooting establishes motive to harm him; 2) admitting to an altercation with Irwin raised the risk of being charged with simple assault; and 3) plaintiff was on bond and admitting to being a Jim's Bar was a violation of his conditions of release.  These reasons were articulated on the record at the hearing.  Id. at ¶¶ 36-37.

Walsh became anger and requested Judge Melograne to hold plaintiff in contempt and incarcerate him.  Judge Melograne declined to do so.  He did not order plaintiff to testify at the hearing.  He did advise plaintiff that the matter could be taken to a Common Pleas Court judge.

4

The charges against Crews were held over for court; Spencer waived her charges to the Court of Common Pleas.  Id. at ¶¶ 37-38, 44, 47.

Walsh immediately drafted a petition for contempt of court and requested therein that plaintiff be incarcerated, notwithstanding that the charges against both Crews and Spencer were held over for court.  In the petition Walsh directly stated that Judge Melograne indicated "he did not have the authority to hold [plaintiff] in contempt for his failure to testify" and that the matter would have to be taken before a Common Pleas Court judge.[2]  Id. at ¶¶ 39, 42-44.

Walsh presented the petition for contempt directly to Judge DiSalle.  This bypassed the standard court-wide criminal assignment protocol for calendar year 2022 that Judge DiSalle, as President Judge of the Court of Common Pleas of Washington County, had put into operation by order on December 27, 2021.  Id. at ¶¶ 48-49.  This order of court is formally referenced as "the Local Rules of Court Edition of the State Rules" and is a binding order of court.  It is not "mere guidance or a guideline."  Id. at ¶ 49.

Under the Local Rules of Court Edition, the criminal judges for calendar year 2022 were Judge Valerie Costanzo and Judge Brandon Neumann.  Judge DiSalle was assigned to "Problem Solving Court issues, Orphan's Court matters and administrative duties."  Judge Neumann was the criminal motions judge in December of 2022 for any criminal motion presented in the Court of Common Pleas of Washington County.  In addition, Judges Costanzo and Neumann were

---

[2] Plaintiff avers that placing this statement in the petition falsely suggested that Judge Melograne considered Walsh's request for incarceration.  Id. at ¶ 42.  In fact, Judge Melograne did state he lacked the authority to hold plaintiff in contempt and indicated that the issue being pursued by Walsh could be revisited by a Common Pleas Court judge.  See n.4, *infra*

identified on the 2022 Washington County Court of Common Pleas Official Court Calendar as the two criminal motions judges for 2022.  Id. at ¶¶ 50-53.[3]

Similarly, under the Washington County Court of Common Pleas' "Zone Prosecution" system, criminal matters were divided between the criminal judges of the court based on the magisterial district judge who presided over the preliminary proceedings in the case.  In December of 2022, Judge Costanzo heard the cases that arose from Judge Melograne's district. Id. at ¶¶ 54-55.

When Walsh presented his petition to Judge DiSalle, Judge Neumann was the criminal motions judge for the month of December and Judge Costanzo was the judge assigned to the case under the Zone Prosecution system.  Id. at ¶¶ 55, 60.  In addition, Judge DiSalle had reviewed and issued the search warrant applications for plaintiff's home and cellular telephone and had been exposed to the information in those applications.  Based on that information Judge DiSalle had concluded there was probable cause for the warrants.  Id. at ¶¶ 57-58.  Walsh knew all of this and elected to bypass these procedural avenues for assignment of criminal matters and present the petition directly to Judge DiSalle.  Id. at ¶ 59.  Walsh and Judge DiSalle had a pattern and practice of doing this.  Id. at ¶ 57.  This practice had been in place for approximately two years. Id. at ¶ 62.

Notwithstanding the various pre-established systems for assignment of criminal matters, Judge DiSalle acted on the petition and convened a hearing on December 29, 2022.  At the hearing, Judge DiSalle responded to plaintiff's invocation of the privilege against self-incrimination through counsel by stating: "But we're not trying [plaintiff] for [murder], yet."  At

_____

[3] The 2024 Local Rules order listed Judge DiSalle as a backup judge on search warrants.  Id. at ¶ 57.

the hearing, plaintiff was not called to testify.  Judge DiSalle nevertheless held plaintiff in contempt and sentenced him to five days to six months.  Id. at ¶¶ 61, 64, 68.  Plaintiff was taken to jail and served the five days over the holiday.  Id. at ¶ 70.

Judge DiSalle's Opinion on the matter did not mention that plaintiff invoked his Fifth Amendment rights upon the advice of counsel.  It also did not mention that plaintiff was not called to testify in front of Judge DiSalle.  Id. at ¶¶ 65-66.

After serving five days, plaintiff was released on parole.  A female parole officer initially was assigned to supervise plaintiff.  John Ridge was the director of the Washington County Office of Probation and Parole.  John Ridge was also the husband of Leslie Ridge, who served as Walsh's first assistant in the Washington County District Attorney's Office.  Walsh contacted a subordinate of John Ridge and directed him to arrange for Walsh's brother, Joel Walsh, to become plaintiff's supervisor.  Joel Walsh was then assigned to supervise plaintiff.  Thereafter, plaintiff's counsel contacted John Ridge and demanded that Joel Walsh be removed from the assignment.  Although John Ridge initially refused to capitulate to the demand, Joel Walsh eventually was removed as plaintiff's parole supervisor.  Walsh's actions in pursuing the assignment were "unnecessary" and done maliciously with the intent to intimidate and harass plaintiff for invoking his Fifth Amendment rights.  Id. at ¶¶ 72-78.

Defendant DiSalle moves for dismissal on several grounds.  First, he contends his actions underlying the complaint assertedly were all undertaken in his official capacity and therefore he is protected from suit by judicial immunity.  Second, he is protected by Pennsylvania's sovereign immunity which extends to officers of the court and includes judges of the Courts of Common Pleas.  Third, abstention under Younger v. Harris, 401 U.S. 37 (1971), apples and precludes this court from interfering with the underlying state criminal case.  Finally, defendant DiSalle maintains that the bar from litigation recognized in Heck v. Humphrey, 512 U.S. 477 (1994),

applies and precludes an adjudication of plaintiff's claims because a ruling in plaintiff's favor would call into question the validity and integrity of his conviction for contempt.

Defendant Walsh moves for dismissal on similar grounds. He asserts that his actions underlying the complaint purportedly were all undertaken in his official capacity and therefore he is protected from suit by absolute prosecutorial immunity. Second, plaintiff's claim of a civil rights conspiracy rests on little more than bald assertions and legal conclusions masquerading as fact. Third, plaintiff's state law claims are barred by high public official immunity. Finally, Walsh argues that all of plaintiff's claims are predicated on the contention that his conviction for contempt was in violation of his constitutional rights; but his criminal conviction has not been overturned or vacated and thus he is barred under Heck v. Humphrey from pursuing any injury or loss stemming from it.

Plaintiff responds that parsing through the state court proceedings shows that defendants knew they were violating plaintiff's rights and circumventing the controlling administrate law to accomplish the violation. For example, they supposedly had to know they were seeking to have plaintiff answer questions that could incriminate him through one of four ways: he was a suspect in the murder; he was at risk of being charged with simple assault; admitting to an altercation with Irwin would give rise to a basis to establish motive for the murder; and admitting to being present in bar was a violation of his conditions of bond from a separate criminal case. Further, any basis for contempt occurred solely before Judge Melograne and only he could hold plaintiff in contempt for that specific refusal to testify.[4] In addition, Walsh did not suffer any injury from plaintiff's invocation. And from plaintiff's perspective the state court records are replete with

---

[4] The transcript from the hearing before Judge Melograne reveals that he advised the parties as follows: "I do not have the authority to hold someone in contempt – that is an issue left for a Common Pleas judge." Transcript of December 9, 2022 (Doc. No. 1-3), at p. 36.

irregularities that clearly demonstrate both defendants knew they were violating plaintiff's Fifth Amendment right against self-incrimination and bypassing all the established administrative rules of court to do so.

Further, plaintiff asserts that Judge Disalle employed erroneous and offensive reasoning to justify his finding of contempt. And his ruling and sentence assertedly were issued in disregard of the controlling Pennsylvania authority governing the utilization of the sanction of contemp. Collectively, these aspects of the state court record allegedly reveal that defendants' treatment of plaintiff constituted outrageous misconduct that has no place in the American system of justice.

As to the issue of immunity, plaintiff maintains that DiSalle acted in the clear absence of all authority and thus he lacked subject matter jurisdiction over the petition. The lack of an injury to Walsh and the ongoing pattern of defendants in violating established court protocol for the assignment of cases and criminal matters provide further support for a finding that DiSalle acted in the absence of jurisdiction and as part of a conspiracy to punish plaintiff for invoking his constitutional rights. Plaintiff further maintains that these same facts and circumstances preclude DiSalle from the protection of Sovereign Immunity as to plaintiff's state law claims.

Plaintiff contends that the state court records likewise sufficiently demonstrate that Walsh knew he had not been injured and he knowingly presented a petition that failed to give a Common Pleas Court judge subject matter jurisdiction to act on the matter presented. Thus, the course of conduct charted by Walsh and highlighted in the complaint was sufficient to show he was acting out of personal anger towards plaintiff and was not functioning as the State's advocate in pursuing the petition and seeking a finding of contempt. He intentionally bypassed established case assignment orders and rules to get the petition in front of Judge DiSalle. And he had been engaging in a similar pattern of conduct for over two years in order to violate other

9

defendants' Due Process rights.  From plaintiff's perspective, "[t]here is of course no tradition of prosecutors in America maliciously going after witnesses to incarcerate them in retribution for invoking their constitutional rights."  Plaintiff's Brief in Opposition to Defendant Walsh's Motion 9Doc. 29) at p. 23.  All of which supposedly combine to demonstrate that Walsh was not acting within the traditional functions of a prosecutor and remove him from the protections of absolute immunity, qualified immunity or high public official immunity.[5]  Thus, plaintiff maintains that the complaint presents sufficient averments to proceed with the claims against both defendants and overcome their invocation of various immunities and other defenses.

The record before the court demonstrates that defendants are entitled to dismissal of the § 1983 claims against them based on judicial and absolute immunity.  Entitlement to dismissal based on these immunities appears on the face of the complaint and the state court records attached thereto.

Plaintiff carefully presents his federal claims against Judge DiSalle as being brought only in his individual capacity.  But plaintiff's complaint is grounded only in acts that Judge DiSalle took in his official capacity and thus the court will address that dimension of plaintiff's claims before evaluating the same acts through the lens of claims brought in an individual capacity.

Plaintiff's claims against Judge DiSalle in his official capacity are barred by the Eleventh Amendment.  Federal suits against the state are barred by the Eleventh Amendment.[6]  Alabama v. Pugh, 438 U.S. 781, 781-82 (1978).  Eleventh Amendment immunity applies to suits against the state regardless of the relief sought.  In re Kish, 212 B.R. 808, 814 (Bkrtcy D. N.J. 1997)

---

[5]  Walsh did not raise the issue of qualified immunity in his motion to dismiss.

[6] The Eleventh Amendment "enacts a sovereign immunity from suit, rather than a nonwaivable limit on the federal judiciary's subject-matter jurisdiction."  Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261, 267 (1997).

("the 'jurisdictional bar [of the Eleventh Amendment] applies regardless of the relief sought'")
(citing Pennhurst State School & Hosp. v. Halderman, 465 U.S. 89, 100–01 (1984)); see also
Cory v. White, 457 U.S. 85, 90 (1982) ("It would be a novel proposition indeed that the Eleventh
Amendment does not bar a suit to enjoin the state itself simply because no money judgment is
sought.").  Suits against a state agency or a state department are considered to be suits against a
state which are barred by the Eleventh Amendment.  In re Kish, 221 B.R. 118, 124-25 (Bkrtcy.
D. N.J. 1998) (quoting Geis v. Board of Educ. of Parsippany–Troy Hills, Morris Cnty., 774 F.2d
575, 580 (3d Cir.1985)); accord Hafer v. Melo, 502 U.S. 21, 25 (1991); Haybarger v. Lawrence
County Adult Probation and Parole, 551 F.3d 193, 198 ("the Eleventh Amendment applies to
suits against subunits of the State") (citing Pennhurst, 465 U.S. at 100)).  And suits against state
officials for acts taken in their official capacity must be treated as suits against the state.  Hafer,
502 U.S. at 25.

"The Commonwealth [of Pennsylvania] vests judicial power in a unified judicial system,
and all courts and agencies of [that system] are part of the Commonwealth government rather
than local entities."  Haybarger, 551 F.3d at 198 (citing Benn v. First Judicial Dist. of Pa., 426
F.3d 233, 240-41 (3d Cir. 2005) and Pa. Const. art. V, § 1)).  It likewise is settled that
"Pennsylvania's judicial districts . . . are entitled to Eleventh Amendment immunity."  Id.

The Washington County Court of Common Pleas is a subunit of the Commonwealth's
unified judicial system.  See 42 Pa. C. S. § 901 ("The Commonwealth is divided into 60 judicial
districts, numbered and composed as follows: . . . Twenty-seventh – County of Washington . . .
.").  The Court of Common Pleas of Washington County is vested with unlimited general
jurisdiction of all actions and proceedings cognizable by law or usage in the courts.  42 Pa. C. S.
§ 931; accord Pa. Const. Art. V, § 5 (there shall be "one court of common pleas for each judicial
district . . . having unlimited original jurisdiction in all cases except as may otherwise be

provided by law."). And as a court within the Commonwealth's unified judicial system, the Court of Common Pleas of Washington County has the inherent authority to conduct contempt proceedings in matters before it. Maria Shop, Inc. v. Baird, 670 A.2d 671, 672-73 (Pa. Super. Ct. 1996) (citing Appeal of Levine, 95 A.2d 222, 225 (Pa. 1953) ("The right to punish for such contempt is inherent in all courts.").

To the extent plaintiff bring his claims against Judge DiSalle for acts he took in his official capacity, the claims are brought against the Washington County Court of Common Pleas. The Washington County Court of Common Pleas is a state entity. Immunity attaches to the actions of the court pursuant to the Eleventh Amendment unless the state has waived its own immunity. Pennsylvania expressly has reserved its immunity against being sued. See Lavia v. Pa. Dep't of Corr., 224 F.3d 190, 195 (3d Cir. 2000) (citing 42 Pa. C. S. § 8521(b) ("Nothing contained in this subchapter [on actions against Commonwealth parties in civil actions and proceedings] shall be construed to waive the immunity of the Commonwealth from suit in Federal courts guaranteed by the Eleventh Amendment to the Constitution of the United States."); accord Bryant v. Cherna, 520 F. App'x 55, 57 (3d Cir. 2013) ("[T]he state courts of Pennsylvania, . . . , are entitled to immunity from suit in federal court pursuant to the Eleventh Amendment."); Youst v. Roth, Civ. No. 23-848, 2023 WL 3821813, *9, n.12 (E.D. Pa., June 5, 2023) ("Any official capacity claims against the Judges are really claims brought against the Commonwealth of Pennsylvania because Judges of the Court of Common Pleas and Magisterial District Judges are considered officials of the Commonwealth. As such, they are entitled to share in the Commonwealth's Eleventh Amendment Immunity."). Accordingly, plaintiff's claims against Judge DisSalle in his official capacity must be dismissed.

Plaintiff's claims against Judge DiSalle in his individual capacity likewise must be dismissed because they are barred by the doctrine of judicial immunity. "[J]udicial immunity is

an immunity from suit, not just from the ultimate assessment of damages." Mireles v. Waco, 502 U.S. 9, 11 (1991).  It applies to judicial officers for actions undertaken in the performance of their official duties, thereby relieving them from liability for judicial acts.  Azubuko v. Royal, 443 F.3d 302, 303 (3d Cir. 2006) (citing Mireles v. Waco, 502 U.S. 9 (1991)).  Furthermore, a "judge will not be deprived of immunity because the action he took was in error, was done maliciously, or was in excess of his authority; rather, he will be subject to liability only when he has acted in the 'clear absence of all jurisdiction.'" Azubuko, 443 F.3d at 303 (citing Stump v. Sparkman, 435 U.S. 349, 356-57 (1978)).

To determine whether judicial immunity applies, courts engage in a two-part inquiry. Gallas v. Supreme Court of Pennsylvania, 211 F.3d 760, 768 (3rd Cir. 2000) (citing Mireles v. Waco, 502 U.S. 9, 11 (1991)).  "First, a judge is not immune from liability for nonjudicial actions, i.e., actions not taken in the judge's judicial capacity." Id. (quoting Mireles, 502 U.S. at 11).  Second, there is no immunity "for actions, though judicial in nature, taken in the complete absence of all jurisdiction." Id.

Initially, it must be determined whether the judge acted in his or her official judicial capacity.  The factors determinative of whether an act by one clothed with judicial authority was a "judicial" one "relate to the nature of the act itself, i.e., whether the act is normally performed by a judge, and with respect to the parties, i.e., whether they dealt with the judge in his judicial capacity." Id. at 768-69 (citing Stump v. Sparkman, 435 U.S. 349, 362 (1978)).  The "task is to draw the line between truly judicial acts, for which immunity is appropriate, and acts that simply happen to have been done by judges, such as administrative acts." Id. at 769 (quoting Forrester v. White, 484 U.S. 219, 225-27 (1988)).

Here, the nature of the proceeding was the convening of a hearing on a petition for contempt.  The hearing was initiated by a petition filed on the court's docket by the Washington

13

County District Attorney.  The judge held the hearing in the Washington County Courthouse. Plaintiff appeared with counsel and argued his position to the judge.  The hearing was transcribed by a court reporter.  The judge made a ruling on a disputed matter and imposed a sanction at the conclusion of the hearing.  Plaintiff was entitled to take an appeal from the adverse decision and he did so.

The nature of the acts, entertaining a petition for contempt by conducting a hearing, resolving a disputed matter and imposing a sanction are hallmark functions performed by a judge.  And the parties dealt with the judge with every expectation that he would exercise his judicial authority to resolve the dispute that had arisen.  No one at the hearing raised any issue or took a position that suggested the judge might act or be acting in some other capacity.

It follows that Judge DiSalle was acting in an official capacity with regard to the core actions giving rise to plaintiff's civil rights complaint.  And ample authority recognizes that judges enjoy judicial immunity when conducting contempt proceedings.  See Stump, 435 U.S. at 361 (citing with approval the analysis used in McAlester v. Brown, 469 F.2d 1280, 1282 (5th Cir. 1972) to determine whether the act of holding a member of the public in contempt was a judicial function: "at the time of the altercation [giving rise to the suit] Judge Brown was not in his judge's robes, he was not in the courtroom itself, and he may well have violated state and/or federal procedural requirements regarding contempt citations," but "the confrontation arose directly and immediately out of a visit to the judge in his official capacity."); Forrester v. White, 484 U.S. 219, 227 (1988) ("Similarly, acting to disbar an attorney as a sanction for contempt of court, by invoking a power 'possessed by all courts which have authority to admit attorneys to practice,' does not become less judicial by virtue of an allegation of malice or corruption of motive.") (quoting Bradley v. Fisher, 13 Wall. 335, 354 (1872)); Figueroa v. Blackburn, 208

F.3d 435, 443 (3d Cir. 2000) (ordering a citizen into custody for contempt "was a paradigm

judicial act, and that act does not become nonjudicial because it was wrong.").

Second, the act in question must be within the judge's jurisdiction.  Gallas, 211 F.3d at

768.  A distinction is drawn between "acts in the 'clear absence of all jurisdiction,' which do not

enjoy the protection of absolute immunity, and acts that are merely in 'excess of jurisdiction,'

which do enjoy that protection."  Id. at 769.  The Supreme Court has explained:

> A distinction must be here observed between excess of jurisdiction and the clear absence of
> all jurisdiction over the subject-matter.  Where there is clearly no jurisdiction over the
> subject-matter any authority exercised is a usurped authority, and for the exercise of such
> authority, when the want of jurisdiction is known to the judge, no excuse is permissible.
> But where jurisdiction over the subject-matter is invested by law in the judge, or in the
> court which he holds, the manner and extent in which the jurisdiction shall be exercised are
> generally as much questions for his determination as any other questions involved in the
> case, although upon the correctness of his determination in these particulars the validity of
> his judgments may depend.

Stump, 435 U.S. at 356 n. 6.  In other words, "a judge does not act in the clear absence of all

jurisdiction when the judge enters an order at least *colorably* within the jurisdiction of [his or]

her court."  Gallas, 211 F.3d at 771 (emphasis added).

Here, the record before the court clearly and unequivocally demonstrates that Judge

DiSalle's actions in entertaining the petition, convening a hearing and finding plaintiff in

contempt were judicial acts falling within the general jurisdiction granted to the Pennsylvania

Courts of Common Pleas.  Except as otherwise established by statute or the rules relating to

reassignment, the Pennsylvania legislature has given the Courts of Common Plea "unlimited

original jurisdiction [over] all actions and proceedings" that are cognizable at law or by

established custom and usage in the courts.  42 Pa. C. S. § 931(a).  "All courts of common pleas

have statewide subject matter jurisdiction in cases arising under the Crimes Code."

Commonwealth v. Arcelay, 190 A.3d 609, 614 (Pa. Super. Ct. 2018) (quoting Commonwealth v.

Bethea, 828 A.2d 1066, 1074 (Pa. 2003)).  This broad jurisdiction extends to controversies

15

arising out of the Crimes Code. <u>Bethea</u>, 828 A.2d at 1074 ("Controversies arising out of violations of the Crimes Code are entrusted to the original jurisdiction of the courts of common pleas for resolution.") (citing 18 Pa. C. S. § 102). And of course, such controversies necessarily must include contempt proceedings arising from the administration of proceedings before the court. <u>See</u> <u>Garr v. Peters</u>, 773 A.2d 183, 189 (Pa. Super. Ct. 2001) ("Each court is the exclusive judge of contempts against its process.") (quoting <u>Fatemi v. Fatemi</u>, 537 A.2d 840, 846 (Pa. Super. Ct. 1988) and <u>Neshaminy Water Resources Authority v. Del–Aware Unlimited, Inc.</u>, 481 A.2d 879 (1984)).[7]

A straightforward review of the record establishes that neither of the exceptions to judicial immunity are applicable here. The actions by Judge DiSalle were judicial actions taken in his official capacity as a judge. The Court of Common Pleas of Washington County was vested with subject matter jurisdiction over the proceedings underlying plaintiff's complaint. As a judge of that court, Judge DiSalle likewise had subject matter jurisdiction over those proceedings. As a consequence, he is entitled to judicial immunity and plaintiff's federal section 1983 civil rights claims for false arrest, false imprisonment, malicious prosecution and civil conspiracy are barred.

Plaintiff's protestations to the contrary are unavailing. It has long been settled that a judicial officer acting in the exercise of vested authority retains judicial immunity "even when such acts are in excess of their jurisdiction . . . ." <u>Stump</u>, 435 U.S. at 356. In such settings a judge remains "absolutely immune from liability for his judicial acts even if his exercise of authority is flawed by the commission of grave procedural errors." <u>Id.</u> at 359.

---

[7] This is so because "[t]he contempt power is 'essential to the preservation of the court's authority and prevents the administration of justice from falling into disrepute.'" <u>Marian Shop, Inc.</u>, 670 A.2d at 673 (citing <u>Fisher v. Pace</u>, 336 U.S. 155 (1949)).

Here, violating the various Washington County court rules governing the assignment of cases as plaintiff so vehemently and extensively avers establishes only the Judge DiSalle acted in excess of those assignment rules and administrative procedures. Doing so amounted to an action in excess of those administrative rules, which does not suffice to strip Judge DiSalle of judicial immunity.

Our Court of Appeals has squarely rejected the argument that acting outside the scope of a court rule of procedure amounts to an action taken in the absence of all jurisdiction. In Figueroa, the plaintiff appeared at a scheduled arraignment hearing before an administrative judge of the New Jersey municipal court system. He had been charged with two petty disorderly persons offenses. 208 F.3d at 437. He appeared solely to contest the jurisdiction of the court. He brought a tape recorder to the hearing. The presiding judge, Judge Blackburn, told him to turn the recorder off three times. He did failed to do so. Judge Blackburn then ordered him arrested and removed from the courtroom. She then held him in contempt and sentenced him to thirty days of imprisonment.

Judge Blackburn ordered the immediate execution of the sentence for contempt, which was in contravention of New Jersey Court Rule 1:10–1 ("Execution of sentence shall be stayed for five days following imposition and, if an appeal is taken, during the pendency of the appeal, provided, however, that the judge may require bail if reasonably necessary to assure the contemnor's appearance."). With the assistance of counsel, the plaintiff asked Judge Blackburn twice to stay the balance of his sentence while he appealed. She rejected both requests. 208 F.3d at 437-38.

The plaintiff took an appeal. After serving fifteen days, the Superior Court granted Figueroa a stay pending appeal and thereafter reversed his contempt conviction. Id. at 438.

17

In rejecting the plaintiff's contention that Judge Blackburn's order in complete violation of the governing state rule of procedure and established judicial policy stripped the judge of immunity, the court opined:

> Finally, we reject Figueroa's argument that Judge Blackburn's failure to grant him the five-day stay required by N.J. Ct. R. 1:10–1, because it was in error, was an act taken in the absence of jurisdiction.  Taken to its logical extreme, the argument is that whenever a judge makes an error of law or procedure in a matter properly before him or her, that judge is not entitled to judicial immunity or, stated somewhat differently, a judge does not have jurisdiction to make a mistake.  That, of course, is preposterous.  Judge Blackburn's failure to adhere to the requirements of N.J. Ct. R. 1:10–1 was, without question, as the Magistrate Judge found, an "inexplicable" procedural flaw.  See Figueroa, 39 F.Supp.2d at 494.  It was, however, at most, an act taken in excess of jurisdiction, just as if a judge had imposed a sentence beyond the statutory limit or, recalling the Supreme Court's illustration in Stump, a judge had convicted a defendant of a nonexistent offense.  See Tucker v. Outwater, 118 F.3d 930, 936 (2d Cir.) (declaring that a judge's failure to follow local procedural rules in arraigning a defendant is an act in excess of jurisdiction, but such "mistakes are precisely the kind of 'procedural errors,' albeit 'grave,' that do not deprive a judge of subject matter jurisdiction—or judicial immunity") (quoting Stump, 435 U.S. at 359, 98 S. Ct. 1099), cert. denied, 522 U.S. 997, 118 S. Ct. 562, 139 L.Ed.2d 402 (1997).  Because Judge Blackburn had jurisdiction over the matter before her, she had jurisdiction to err and is entitled to judicial immunity.

Id. at 444-45.  The court likewise concluded that the failure to follow an established judicial directive calling for the transfer of the matter to another court or to abide by the New Jersey Supreme Court's established protocol for exercising summary contempt powers did not jettison the judge's action into the realm of actions taken in the complete absence of all jurisdiction.  Id. at 444, n.9.

Ultimately, the court in Figueroa held that "with respect to the doctrine of judicial immunity, there is no distinction between judges of courts of limited jurisdiction and judges of courts of general jurisdiction."  Id. at 445.  And because Judge Blackburn had subject matter jurisdiction over the proceeding that was commenced before her, it did not matter that her actions in holding the plaintiff in contempt violated the established rules of civil procedure, directives calling for the contempt proceeding to be transferred to another court or the state supreme court's

18

established protocol on contempt proceedings.  What mattered is that she had subject matter jurisdiction over the proceeding that was commenced before her.[8]

Here, plaintiff's arguments that Judge DiSalle acted in the complete absence of all jurisdiction by assertedly violating the Local Rules of Court or the Zone Prosecution assignment system must be rejected for the same reasons the court in Figueroa rejected the argument that analogous violations of rules, directives and precedent sufficiently displaced a judge's entitled to judicial immunity: as a duly elected judge of the Court of Common Pleas of Washington County, Judge DiSalle had general jurisdiction over all matters at law and equity that were brought before that court.  He had subject matter jurisdiction over the contempt proceeding brought against plaintiff.  Exercising that jurisdiction may have been an act in excess of the Local Rules and assignment procedures, but it was not an act in the complete absence of all jurisdiction.  And with that subject matter jurisdiction came judicial immunity.  That immunity bars plaintiff's section 1983 claims to the extent they arise out of the contempt proceedings.

Plaintiff's contentions that Judge DiSalle acted maliciously and for the purpose of circumventing the rightful assertion of plaintiff's constitutional rights are misplaced for essentially the same reasons.  A judicial act "does not become less judicial by virtue of an allegation of malice or corruption of motive."  Forrester, 484 U.S. at 227; accord Cleavinger v. Saxner, 474 U.S. 193, 200 (1985) ("Nor can this exemption of the judges from civil liability be

---

[8]  Other Third Circuit panels have reached this same conclusion under similar scenarios.  See Gallas, 211 F.3d at 771 (an administrative judge's gross failure to follow the strict procedures governing the release of impounded Protection From Abuse records and provide fundamental notice to the interested parties before releasing those records to the public did not amount to actions taken in the complete absence of jurisdiction; at best, they were actions in excess of the judge's jurisdiction; and "even if [the plaintiff] did point to a rule that indicated that another judge should have entertained the application for release of the PFA, we would not hold that Judge Sylvester acted in the clear absence of all jurisdiction in issuing the order.").

affected by the motives with which their judicial acts are performed.") (citation omitted).  And judicial immunity applies "however erroneous the act may have been, and however injurious in its consequences it may have proved to the plaintiff."  Cleavinger, 474 U.S. at 199-200 (quoting Bradley v. Fisher, 13 Wall. 335, 347 (1872)).  It simply is unaffected "by the motives with which judicial acts are performed."  Id. at 200; accord Stump, 435 U.S. at 356-57 ("A judge will not be deprived of immunity because the action he took was in error, was done maliciously, or was in excess of his authority . . . .").  In sum, a court's analysis in this setting "must focus on the general nature of the challenged action, without inquiry into such 'specifics' as the judge's motive or the correctness of his or her decision."  Gallas, 211 F.3d at 769 (citing Mireles, 502 U.S. at 13 ("[T]he relevant inquiry is the 'nature' and 'function' of the act, not the 'act itself.'  In other words, we look to the particular act's relation to a general function normally performed by a judge . . . .") (citation omitted in original)).

In light of this controlling precedent, it does not matter that Judge DiSalle acted maliciously and with the intent to subvert a fair and neutral application of plaintiff's Fifth Amendment rights for the benefit of Walsh's prosecutorial agenda.  It does not matter that his finding against plaintiff was egregiously wrong; it does not matter that plaintiff suffered a deprivation of his constitutional rights and a loss of liberty and great harm from that deprivation. What matters is that Judge DiSalle undertook a judicial act in a setting where he had subject matter jurisdiction.  He did so and is immune from liability in a civil action for damages.

Plaintiff's federal civil rights claims against Walsh suffer from similar shortcomings pursuant to the doctrine of absolute prosecutorial immunity.  As a general matter, prosecuting attorneys are absolutely immune from suits for damages under § 1983 based on activities that are "intimately associated with the judicial phase of the criminal process."  Imbler v. Pachtman, 424 U.S. 409, 430 (1976).  "But a person is not immune from suit for every wrong he commits just

because he happens to be employed as a prosecutor: the inquiry focuses on the nature of the function performed, not the identity of the actor who performed it." Schneyder v. Smith, 653 F.3d 313, 332 (3d Cir. 2011) (internal citation and quotation omitted); accord Odd v. Malone, 538 F.3d 202, 208 (3d Cir. 2008) (same).

Absolute immunity extends to both "activity taken while in court, such as the presentation of evidence or legal argument, as well as selected out-of-court behavior 'intimately associated with the judicial phases' of litigation." Kulwicki v. Dawson, 969 F.2d 1454, 1463 (3d Cir. 1992) (quoting Imbler, 424 U.S. at 430).  To be protected by absolute immunity, out-of-court conduct must "serve[] a quasi-judicial function." Roberts v. Lau, 90 F.4th 618, 624 (3d Cir. 2024) (citing Kulwicki, 969 F.2d at 1463).  "To serve a quasi-judicial function, conduct must be 'intimately associated with the judicial phase of the criminal process' or an analogous judicial proceeding." Id. (citing Imbler, 424 U.S. at 430).  In contrast, actions taken by a prosecutor "in an investigative or administrative capacity" do not garner absolute immunity and are protected only by qualified immunity.  Kulwicki, 969 F.2d at 1463; accord Roberts, 90 F.4th at 624 ("Thus, absolute immunity does not shield 'administrative or investigatory actions unrelated to initiating and conducting judicial proceedings.'") (quoting Weimer v. County of Fayette, 972 F.3d 177, 187 2020) (quoting Odd, 538 F.3d at 208)).

In assessing whether absolute immunity applies, a "court must ascertain just what conduct forms the basis for the plaintiff's cause of action, and it must then determine what function (prosecutorial, administrative, investigative, or something else entirely) that act served." Schneyder, 653 F.3d at 332 (emphasis added); see also B.S. v. Somerset Cnty., 704 F.3d 250, 270 (3d Cir. 2013) (explaining "[t]he key to the absolute immunity determination is not the timing of the investigation relative to a judicial proceeding, but rather the underlying function that the investigation serves and the role the [individual] occupies in carrying it out") (emphasis

added).  These steps "tend to overlap." Roberts, 90 F.4th at 625 (quoting Fogle v. Sokol, 957 F.3d 148, 161 (3d Cir. 2020).

A prosecutor bears the "heavy burden" of establishing entitlement to absolute immunity. Light v. Haws, 472 F.3d 74, 80-81 (3d Cir. 2007) (quoting Forsyth v. Kleindienst, 599 F.2d 1203, 1212 (3d Cir. 1979)).  In light of the Supreme Court's "quite sparing" admonishment regarding the use of absolute immunity, the court is to begin with the presumption that qualified rather than absolute immunity is appropriate.  Carter v. City of Phila., 181 F.3d 339, 355 (3d Cir. 1999) (citing Burns v. Reed, 500 U.S. 478, 486-87 (1991)).  "To earn the protections of absolute immunity at the motion-to-dismiss stage, a prosecutor must show that the conduct triggering absolute immunity clearly appears on the face of the complaint." Roberts, 90 F.4th at 625 (quoting Weimer, 972 F.3d at 187).

"[D]etermining whether a prosecutor is entitled to absolute immunity requires a fact-intensive inquiry that generally cannot be reduced to bright-line rules." Roberts, 90 F.4th at 627. So for example, the fact that the conduct was undertaken post-indictment and sought to generate evidence in support of the prosecution is not determinative.  Id. at 626 ("the fact that a prosecutor sought to generate evidence post-charge cannot be enough to show that their conduct served a prosecutorial function."); see also Fogle, 957 F.3d at 164 ("Our role is not to look at the 'timing of the prosecutor's action (e.g. pre-or post-indictment),' but at the function being performed.") (quoting Odd, 538 F.3d at 210)).  Likewise, the fact that the conduct occurred in a hearing is not in and of itself dispositive.  Odd, 638 F.3d at 210 ("We have rejected bright-line rules that would treat the timing of the prosecutor's action (e.g. pre-or post[-]indictment), or its location (i.e. in-or out-of-court), as dispositive.") (citing Rose v. Bartle, 871 F.2d 331, 346 (3d Cir. 1989); and Kulwicki, 969 F.2d at 1463)).  Accordingly, the focus must be "on the unique facts of each case"

and a proper analysis "requires careful dissection of the prosecutor's actions." Id. at 627 (quoting Odd, 538 F.3d at 210).

Here, the complaint and the reasonable inferences drawn from its averments of fact establish that Walsh 1) subpoenaed plaintiff to testify at an arraignment hearing in an open criminal case; 2) asked plaintiff if he recalled the dates of October 9 and 10, 2022, 3) requested a finding of contempt in front of Judge Melograne after plaintiff invoked the Fifth Amendment; 4) drafted a petition for contempt after Judge Melograne declined to hold plaintiff in contempt; 5) bypassed the regular case assignment rules and presented that petition directly to Judge DiSalle; and 6) presented evidence and argument to Judge DiSalle in the contempt hearing convened on the petition. As explained below, plaintiff's efforts to paint these actions as investigatory or administrative fall short.

It cannot be disputed that a criminal proceeding on homicide charges against Crews and Spencer had been initiated when Walsh served plaintiff with a subpoena. Serving a citizen with a subpoena to appear at a preliminary hearing and provide testimony as a witness for the Commonwealth is a function that is intimately associated with a prosecutor's advocacy role in the judicial process. Only a prosecutor can subpoena witnesses for the Commonwealth. Cf. Commonwealth v. Shell, 1 Pa. C. C. 41, 1885 WL 11107, *1 (Mercer County, Nov. 1885) ("Let the clerk of the criminal courts give a subpoena on behalf of the Commonwealth only on the order of the district attorney, and let the district attorney see to it that only the names of necessary and proper witnesses are placed thereon. This is the proper rule, and should always be followed."). And more importantly, making such decisions and engaging in such actions are at the heart of a prosecutor's role as the advocate for the presentation of the Commonwealth's case.

Similarly, soliciting testimony from an individual on the witness stand, moving for affirmative relief from the presiding judge, drafting a petition for relief from the immediate court

of review, filing the petition with that court and presenting evidence and argument in support of the petition are all hallmark activities which lie at the heart of a prosecutor's adversarial role in the judicial process.  These activities and forms of conduct are adversarial.  Law enforcement officers cannot perform them.  They are not mere investigative or administrative acts.  In other words, they served an adversarial function and were intimately connected to the judicial proceeding in which they occurred.

There is long-standing precedent recognizing that the nature of the acts underlying plaintiff's complaint enjoy absolute immunity.  As Judge Hardiman recognized in authoring the court's opinion in Odd, both the Supreme Court's and the Third Circuit's precedent involving the application of absolute immunity recognize that while the inquiry remains fact-based and bright line rules are to be avoided, conduct that is a core function in the in-court phase of presenting a criminal case consistently has been protected.  Odd, 538 F.3d at 208-12.  For example, in Imbler where the doctrine of absolute immunity was first recognized by the Court, it held that "in initiating a prosecution and in presenting the State's case, the prosecutor is immune from a civil suit for damages under § 1983."  Imbler, 424 U.S. at 431.  In Burns v. Reed, the Court held that appearing as a lawyer for the state in a probable cause hearing provided the prosecutor with absolute immunity as to that conduct, whereas advising the police in the investigative phase of the prosecution was only protected by qualified immunity.  500 U.S. 478, 487 (1991).  The Court reasoned that "[e]xtending immunity to [a prosecutor' role in advising the police] would eviscerate the rule that a prosecutor's administrative and investigatory acts are not absolutely immune because '[a]lmost any action by a prosecutor, including his or her direct participation in purely investigative activity, could be said to be in some way related to the ultimate decision whether to prosecute.'"  Odd, 538 F.3d at 209 (quoting Burns, 500 U.S. at 495).  And in Buckley v. Fitzsimmons, the Court declined to extend absolute immunity to the prosecutor's alleged acts

24

of fabricating evidence to obtain an indictment and making false statements to the press.  509 U.S. 259, 275-77 (1993).  The Court observed that at the time the prosecutor allegedly fabricated the evidence, there was no probable cause to arrest, no indictment had been returned and a judicial proceeding had not been initiated.  In other words, the prosecutor's alleged actions were purely investigatory and outside the protections of absolute immunity.  Id.

The Third Circuit has charted a similar course.  It has "rejected bright-line rules" that would treat the timing of the prosecutor's actions or the location of the conduct as dispositive. Odd, 538 F.3d at 210 (citing Rose, 871 F.2d at 346 and Kulwicki, 969 F.2d at 1463). Nevertheless, it has recognized that these aspects of a prosecutor's conduct can have a direct bearing "upon the nature of the function the prosecutor is performing."  Id. (citing Yarris v. County of Delaware, 465 F.3d 129, 138-39 (3d Cir. 2006); Kulwicki, 969 F.2d at 1467).

The court's jurisprudence reflects the need to anchor absolute immunity to the actual functions of advocacy.  For example, in Yarris the court recognized "where a prosecutor's role as advocate has not yet begun, or where it has concluded, absolute immunity does not attach."  Odd, 538 F.3d at 210 (quoting Spurlock v. Thompson, 330 F.3d 791, 799 (6th Cir. 2003)).  Similarly, in Giuffe v. Bissell, 31 F.3d 1241 (3d Cir. 1994), the court determined that acts "far removed from the 'judicial phases of litigation'" such as facilitating the sale of forfeited property after the criminal case has concluded are not entitled to absolute protection.  Odd, 538 F.3d at 211 (quoting Giuffe, 31 F.3d at 1253).  And certain acts, such as deliberately destroying exculpatory evidence or failing to return property for over a year after a third party has obtained an order directing it be returned are so egregious or contrary to the orderly function of the legal system as to be within the functions of an advocate for the state.  Id. at 211-12 (citing Kulwicki, 969 F.2d 1463 and Reitz v. County of Bucks, 125 F.3d 139, 141-42 (3d Cir. 1997)).

In <u>Odd</u>, the court applied the discernable principles from the precedent highlighted above in considering whether the failure of prosecutors to inform the court about no longer having a need for a detained material witness fell within their functions as an advocate or reflected administrative acts.  In one scenario, the related case had been continued and in the other the related case had been dismissed.  One plaintiff was held for 48 days after the continuance and the other was held for 58 days after the dismissal.  After carefully defining the specific acts in question, the <u>Odd</u> court concluded that the act of keeping the judge informed about the need for detained material witnesses in conjunction with other litigation was not a "quasi-judicial" act.  <u>Id.</u> at 214.  When the prosecutors failed to inform the court that the cases for which the witnesses were needed had been continued for four months/dismissed, their conduct amounted to an administrative oversight that was beyond those functions that are intimately associated with the judicial phase of the litigation.  <u>Id.</u> at 212-14.

In <u>Fogle</u>, the court considered an array of prosecutorial actions that included: 1) placing a critical and highly questionable witness under hypnosis to obtain a more consistent account of his testimony; 2) failing to report past inconsistencies of a witness in an affidavit filed with the court; 3) assisting in coercing a false confession after an arrest had been made; 4) authoring misrepresentations in oral and written reports; 5) assisting and encouraging police officers to obtain false statements from jailhouse informants to corroborate the prosecution's theory of the case; and 6) filing a criminal complaint without probable cause, withholding material exculpatory evidence from the defense, the court and the jury, and committing perjury before and during trial.  957 F.3d at 161-64.  The defendant prosecutors had requested absolute immunity as to all of these actions based on the assertion that they merely provided advice to the investigating officers, interviewed witnesses in preparation of presenting the case, made representations to the

court as part of the prosecutorial process and presented the Commonwealth's case to the court and the jury.  Id.

The court in Fogle upheld this member of the court and concluded that the defendant prosecutors functioned as detectives seeking to search for clues and sure up their case with regard to 1) placing the witness under hypnosis; 3) assisting in obtaining a critical confession; 4) authoring misrepresentations in reports; and 5) generating evidence from jailhouse informants. As to these activities, the nature of the acts were investigatory and the defendants' function in carrying them out could be construed as being the same as that of an investigator.  Consequently, the defendants failed to carry their heavy burden of showing that absolute immunity applied.

In contrast, failing to report past inconsistencies of a witness in a probable cause affidavit "while appearing before a judge and presenting evidence' involve[d] the Prosecutors' conduct as advocates, where they enjoy absolute immunity."  Id. at 162.  Similarly, filing a criminal complaint without probable cause, withholding exculpatory evidence during the in-court presentation of the Commonwealths' case and committing perjury before and during the trial were activities "intimately associated with the judicial phase of the criminal process," which warranted the application of absolute immunity.  Id. at 164.

The above line of precedent makes clear that categorical reasoning cannot be employed in the application of absolute immunity.  See Odd, 538 F.3d at 210 (noting that there is only a tendency for in-court activities to be protected under absolute immunity as compared to out-of-court activities and activities traditionally performed by the police) (citing Erwin Chemerinsky, FEDERAL JURISDICTION 525-26 (4th ed. 2003) and Buckley, 509 U.S. at 275-76)).  Instead, the focus is on the unique facts of each case and a careful dissection of the prosecutor's actions must be undertaken.  And the timing of the actions in relation to the initiation of formal legal process

and location of the activity potentially are relevant factors only to the extent they bear on the nature of the function that the prosecutor was performing.

Here, the activities forming the basis for plaintiff's complaint all are adversarial in nature and were performed as part of Walsh's functioning as an advocate for the Commonwealth.  All of the activities were part of an in-court presentation of evidence to a judge in an ongoing criminal prosecution, including his seeking redress for the alleged defiance of the court's authority in order to coerce evidence from plaintiff.  Each act was a court-related function that a District Attorney has the prerogative to pursue as the state's advocate.  Each was pursued exclusively in an adversarial setting.  And none were acts that a detective or administrative assistance could accomplish independently.  It follows that when Walsh served a subpoena, asked plaintiff an incriminating question, drafted a petition for contempt, presented evidence and argument to the court and obtained a sentence as a sanction for contempt, he was acting as an advocate for the state.  Consequently, absolute immunity attaches to his actions and he is entitled to dismissal based on the face of the complaint.

Plaintiff's arguments to the contrary are unavailing.  First, Walsh was more than "a complaining witness" when he prepared the petition for contempt and presented it to the court. He was advocating in his role as a prosecutor in open court, which involves the exercise of executive authority that a complaining witness does not possess.  And second, the fact that his motive was malicious in that he sought to punish plaintiff for invoking his constitutional rights does not strip Walsh from reaping the protections of absolute immunity.  See Kulwicki, 969 F.2d at 1464 (the consideration of a prosecutor's motive is irrelevant where he or she is performing a core prosecutorial function because "[c]onsideration of personal motives is directly at odds with the Supreme Court's simple functional analysis of prosecutorial immunity"); Rose, 871 F.2d at 347 n. 12 ("defendants' motives are irrelevant to the immunity determination") (citing Jennings

v. Shuman, 567 F.2d 1213, 1221-22 (3d Cir. 1977)); Bernard v. County of Suffolk, 356 F.3d 495, 507 (2d Cir. 2004) ("we hold that a political motive does not deprive prosecutors of absolute immunity from suit for authorized decisions made in the performance of their function as advocates.").

Finally, the fact that Walsh's actions in seeking plaintiff's testimony in the proceeding against Crews and Spencer can be viewed as "investigating" plaintiff's role in Irwin's death does not change the nature of Walsh's actions.  It is undisputed that Walsh subpoenaed plaintiff in an open criminal case, solicited testimony in open court, drafted a petition and presented it to the court and presented evidence and argument to a court of common pleas judge.  Admittedly, Magisterial District Judge Melograne asked Walsh a number of times whether plaintiff was a material witness and whether his testimony was needed.  And in arguing to Judge DiSalle for the sanction of contempt, Walsh highlighted the need to call witnesses through the subpoena power and obtain their answers to questions under oath as part of building the Commonwealth's case.  See Hearing Transcript of December 29, 2022 (Doc. No. 1-2) at 35-6.  But the fact that the information sought has the potential to broaden the prosecutor's understanding of the events underlying the crimes being prosecuted is just not the type of "investigatory activity" that has been held to fall outside the protections afforded when prosecutors engage in core adversarial functions.  And because that is the type of function Walsh was performing at all times material to the allegations of the complaint, plaintiff's efforts to plead around or otherwise defeat the application of absolute immunity fall short.

Plaintiff's state law torts against defendants likewise are subject to dismissal for essentially the same reasons.  As to the claims against Judge DiSalle, Pennsylvania law also has adopted and long-followed the principle that "judges are absolutely immune from liability for damages when performing judicial acts, even if their actions are in error or performed with

malice, provided there is not a clear absence of all jurisdiction over the subject matter and person." Feingold v. Hill, 521 A.2d 33, 36 (Pa. Super. Ct. 1987) (citing Stump, 435 U.S. 349 and Praisner v. Stockner, 459 A.2d 1255, 1261 (Pa. Super. Ct. 1983)).  This immunity extends to judges of the courts of common pleas and dates back to at least the 1800s.  Id. at 35-37 (citing Hanna v. Slevin, 8 Pa. Super. 509, 510 (1898)).

As explained above, all of the conduct underlying plaintiff's claims against Judge DiSalle stems from judicial actions he took as a member of the Washington County Court of Common Pleas and he did not act in the clear absence of all jurisdiction.  Consequently, he is entitled to absolute immunity under Pennsylvania law as to plaintiff's state law claims for false imprisonment, false arrest, malicious prosecution, abuse of process and the intentional infliction of emotional distress.

Similarly, in Pennsylvania the Commonwealth and its agencies and employees enjoy sovereign immunity.  See Shoop v. Dauphin County, 766 F. Supp. 1327, 1333–34 (M.D. Pa. 1991) ("The Pennsylvania General Assembly, after the judicial abolition of sovereign immunity by the Pennsylvania Supreme Court in Mayle v. Pennsylvania Dep't of Highways, 479 Pa. 384, 388 A.2d 709 (1978), reaffirmed by statute the concept of immunity for the Commonwealth and its employees.").  The statute provides: "the Commonwealth, and its officials and employees acting within the scope of their duties, shall continue to enjoy sovereign immunity and official immunity and remain immune from suit except as the General Assembly shall specifically waive the immunity."  1 Pa. C. S. § 2310.7.   This immunity applies to Commonwealth employees in both their official and individual capacities, so long as the employees are "acting within the scope of their duties." Maute v. Frank, 657 A.2d 985, 986 (Pa. Super. 1995).

Judges and their staff are Commonwealth employees afforded sovereign immunity. Feingold, 521 A.2d at 546-48.  As such, judges of the court of common pleas are immune from any tort liability arising from acts performed within the jurisdiction of their courts.  Id. at 545-46.

Judge DiSalle's actions were judicial in nature and were not undertaken in the complete absence of all jurisdiction.  As a result, he is entitled to the protections of sovereign immunity. Consequently, all of plaintiff's state law claims against him are barred by that immunity.

Plaintiff's state law claims against Walsh also are barred by Pennsylvania law.  The Pennsylvania Supreme Court has opined:

> It has long been held that high public officials are immune from suits seeking damages for actions taken or statements made in the course of their official duties.  This common law doctrine of tort immunity existed before enactment of the Political Subdivision Tort Claims Act, 42 P.S. § 8541 *et seq*., and was not abrogated by it.  Lindner v. Mollan, 544 Pa. 487, 492–93, 677 A.2d 1194, 1196 (1996).

Durham v. McElynn, 772 A.2d 68, 69 (Pa. 2001).  It has described the boundaries of this immunity as "exempt[ing] a high public official from all civil suits for damages arising out of false defamatory statements and even from statements or actions motivated by malice, *provided the statements are made or the actions are taken in the course of the official's duties or powers and within the scope of his authority, or as it is sometimes expressed, within his jurisdiction . . . .*"  Id. (Emphasis in original; citations omitted) (quoting Matson v. Margiotti, 88 A.2d 892, 895 (Pa. 1952).  "A liberal construction is applied to determine whether an action falls within the official's duties."  Barto v. Felix, 378 A.2d 927, 929 (Pa. Super. Ct. 1977).

Absolute privilege under Pennsylvania law extends only to "high public officials." Linder, 677 A.2d at 1197-98.  Whether a public officer falls within this protection involves consideration of "the nature of his duties, the importance of his office, and particularly whether or not he has policy-making functions."  Montgomery v. City of Philadelphia, 140 A.2d 100, 105 (Pa. 1958) (collection authority in support).  It also involves "the public interest in seeing that the

31

official not be impeded in the performance of important duties [, which] is pivotal." <u>Durham</u>, 772 A.2d at 70.

High public official immunity extends to district attorneys as well as assistant district attorneys. <u>Id.</u> at 69-70 (citing with approval <u>McCormick v. Specter</u>, 275 A.2d 688 (Pa. Super. Ct. 1971) (district attorney who was sued for defamation as a result of statements made at a press conference was immune, since the statements were made in the course of his official duties to inform the public regarding a matter pending in his office); <u>accord</u> <u>Mosley v. Observer Publishing Co.</u>, 619 A.2d 343 (Pa. Super. Ct. 1993), <u>appeal</u> <u>denied</u>, 629 A.2d 1382 (Pa. 1993) (district attorney was entitled to both absolute and official immunity). The protection applies to causes of action in tort predicated on a violation of a plaintiff's constitutional rights. <u>Durham</u>, 772 A.2d at 68-9. And the motives of the defendant in carrying out the actions are "wholly immaterial." <u>Matson</u>, 88 A.2d at 897.

Walsh was the acting District Attorney for Washington County when he undertook each act forming the bases for plaintiff's Amended Complaint. He was acting as the advocate for the Commonwealth and engaging in prosecutorial functions when he subpoenaed plaintiff, called him to the stand, questioned him, sought a finding of contempt, filed a petition and sought the sanction of contempt. His actions were thus taken in the course of his official duties and were within the scope of his authority. It follows that he is entitled to high public official immunity under Pennsylvania law and all of plaintiff's state law claims are barred by that immunity.

For the reasons set forth above, defendants' motions to dismiss based on judicial, absolute, sovereign and public official immunity will be granted. Appropriate orders will

follow.[9]

Date: September 27, 2024

s/David Stewart Cercone
David Stewart Cercone
Senior United States District Judge

---

[9]   The cases discussing the justifications for the immunities which bar plaintiff's claims are legion.  Those justifications highlight the chilling, hampering effect and potential erosion of public confidence that would occur from failing to uphold the immunity for officials occupying positions of public trust such as those held by defendants as compared to the potential gravity of the harms that flow to individuals such as plaintiff.  See, e.g., Stump, 435 U.S. at 355 ("As early as 1872, the Court recognized that it was 'a general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him, [should] be free to act upon his own convictions, without apprehension of personal consequences to himself.'") (quoting Bradley v. Fisher, 13 Wall. at 347); McAlester v. Brown, 469 A.2d 1280, 1282-83 (5th Cir. 1972) ("Even though there may be an occasional diabolical or venal judicial act, the independence of the judiciary must not be sacrificed one microscopic portion of a millimeter, lest the fears of section 1983 intrusions cow the judge from his duty.  We have read and reread Justice Douglas' dissent to Pierson v. Ray, [386 U.S. 547, 558-67 (1967)], and we too are mortified by the specter of deprivations of the civil rights of our citizenry.  But when the infringement comes at the hands of a judge, our system offers its own built-in corrective - the improprieties of judges may be attacked and appealed from, either directly or collaterally.  Because the consequences would be so costly, the abolition of judicial immunity is not appropriate as an additional curative.  A robe does not clothe a person with rectitude, but it must protect him from being subjected to liability at the behest of the disgruntled or the disgusted."); Imbler, 424 U.S. at 422-24 ("The common-law immunity of a prosecutor is based upon the same considerations that underlie the common-law immunities of judges and grand jurors acting within the scope of their duties.  These include concern that harassment by unfounded litigation would cause a deflection of the prosecutor's energies from his public duties, and the possibility that he would shade his decisions instead of exercising the independence of judgment required by his public trust."); Montgomery, 140 A.2d at 103-4 & n.7 ("[A]bsolute immunity is designed to protect the official from the suit itself, from the expense, publicity, and danger of defending the good faith of his public actions before a jury.  And yet, beyond this lies a deeper purpose, the protection of society's interest in the unfettered discharge of public business and in full public knowledge of the facts and conduct of such business.  Absolute immunity is thus a means of removing any inhibition which might deprive the public of the best service of its officers and agencies."); Matson, 88 A.2d at 899–900 ("Even though the innocent may sometimes suffer irreparable damage, it has been found to be in the public interest and therefore sounder and wiser public policy to "immunize" public officials, for to permit slander, or libel, or malicious prosecution suits, where the official's charges turn out to be false, would be to deter all but the most courageous or the most judgment-proof public officials from performing their official duties and would thus often hinder or obstruct justice and allow many criminals to go unpunished.").  These justifications and concerns meaningfully are implicated here.

cc:    Noah Geary, Esquire
       Marie Milie Jones, Esquire
       Maria N. Pipak, Esquire
       Michael R. Lettrich, Esquire
       Jennifer M. Herrmann, Esquire
       Michael Daley, Esquire

       (*Via CM/ECF Electronic Mail*)